**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 1:23-cv-02986

**NATHAN FELDMAN**, individually, and as
Father and Next Friend, on behalf of his two
minor children, **O.F.** and **N.F.**,

       Plaintiffs,

v.

**DENVER PUBLIC SCHOOLS**, the
**DENVER PUBLIC SCHOOLS BOARD OF
EDUCATION**, the **SLAVENS SCHOOL**,
**ALEX MARRERO**, in his official capacity as
Superintendent of Denver Public Schools, and
**KURT SIEBOLD**, in his individual capacity as
official capacity as Principal of the Slavens
School, **KATHERINE DIAZ**, in her individual
capacity and her official capacity as Family
Constituency Specialist, **CHRISTINA
SYLVESTER**, in her official capacity as
Director of Operations, **KELLY WALTERS**, in
her official capacity as a Teacher, and
**GRETEL PAVAO**, in her official capacity as a
Teacher,

       Defendants.

**JURY TRIAL DEMANDED**

---

**VERIFIED COMPLAINT**

---

     Plaintiff Nathan Feldman, individually, and as Father and Next Friend and on behalf of his

minor children, Plaintiffs O.F. and N.F. (collectively, "Plaintiffs"), file this Verified Complaint

against Defendants Denver Public Schools, the Denver Public Schools Board of Education, the

Slavens School, Alex Marrero, in his official capacity as Superintendent of Denver Public Schools,

Kurt Siebold, in his official capacity as Principal of the Slavens School, Katherine Diaz, in her

official capacity as Director of Operations, Kelly Walters in her official capacity as a Teacher, and Gretel Pavao, in her official capacity as a Teacher (collectively, "DPS", the "District" or "Defendants") for the unlawful governmental restriction of student speech in violation of the Free Speech Clause of the First Amendment to the United States Constitution, for the unlawful governmental discrimination on the basis of viewpoint in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and federal statutory law for discriminating on the basis of sex in a school that receives federal financial assistance in violation of Title IX of the Education Amendments of 1972 ("Title IX"), and in further support thereof, Plaintiffs allege as follows:

## INTRODUCTION

### *"Denver Public Schools doesn't allow for other flags."*
–   Defendant Kurt Siebold, Principal of the Slavens School

Students do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Even in the school setting, the government cannot "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). But Denver Public Schools system does not care what the law or United States Supreme Court says, nor does it care about the rights the United States Constitution guarantees to *all* Americans, including students like O.F. and N.F. Frankly, the only thing Denver Public Schools cares about is furthering its insatiable appetite to rise in the ranks of activist entities that push a single-sided narrative—and Denver Public Schools is using children to do so.

Plaintiffs O.F. and N.F. are twin siblings enrolled at the Slavens School, which is just one of the 205 schools within the Denver Public Schools system. As third graders at the Slavens School, O.F. and N.F. are subject to the actions DPS officials take in furthering the District's policy

initiatives, one of which includes the eradication of speech and expression of any viewpoints concerning the topic of sex that differ from the District's own views.

To further its agenda, the District passed and implemented a policy titled "Resolution on Inclusion for Our LGBTQIA+ Employees, Students, and Community Members." (the "policy"), which guarantees *the right* to post rainbow flags or other signs supporting the District's favored viewpoint on the topic of sex. But for students like O.F. and N.F. who hold views that differ from the District's views, no such right exists—in fact, speech or expression of O.F. and N.F.'s views are explicitly prohibited. As Kurt Siebold, the principal at the Slavens School as made unequivocally clear, "the District doesn't allow for other flags."

> the District supports **the right** of its employees to post in their classrooms, offices, or halls **a rainbow flag or other sign of support for LGBTQIA+ students** or staff, because these are symbols consistent with the District's equity-based curriculum.

Each day at school, O.F. and N.F. are exposed dozens, if not hundreds, of "Progress Pride Flags" that DPS officials have strung throughout the Slavens School classrooms and halls as a means of expressing and promoting DPS' favored viewpoint on the topic. Due to the fact that Plaintiffs' views differ, Plaintiffs simply requested to have their views expressed, as well. But DPS has refused, and continues to refuse, to permit Plaintiffs speech or expression to even exist in its schools.

DPS is fully aware and it knows that its policy is unlawful, that it has violated Plaintiffs rights, and by continuing to deprive Plaintiffs of their rights to free speech and expression, DPS is intentionally, knowingly, willfully, purposefully, and maliciously engaging in patent viewpoint discrimination. Yet it does not care, and that is because Denver Public Schools has convinced itself that it is not an educational system but instead, an activist organization, as made clear in the very same policy mentioned above.

Specifically, it is DPS policy that it will serve as activists and:

**[T]he District will continue to push** the federal and state government and national corporations to eliminate binary categories that prohibit students from self-identifying outside of those non-binary gender categories; and

**[T]he District will not wait for such adult acceptance or require parents' or guardians' consent** before honoring the student's self-reported gender identity and gender expression.

Plaintiffs file this action to obtain injunctive relief prohibiting Denver Public Schools from depriving them of their First Amendment rights and to ensure it fulfills its duties as an educational institution where all views and protected speech are welcome, equally. Not once have Plaintiffs sought to silence or chill the District's views, nor have they even requested that its Progress Pride Flags be removed. All Plaintiffs asked was for the District to allow them to have a flag displayed that represents their views, too.

While a debate rages on the very nature of human identity and existence throughout the United States and much of the world, Denver Public Schools is not entitled to pick which side its on. As a public entity tasked with educating children, it is of the utmost importance that it adheres to the Constitution guarantees of free speech and expression. Indeed, along with these freedoms is the "freedom to differ[, which] is not limited to things that do not matter much. That would be a mere shadow of freedom." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "The test of its substance is the right to differ as to things that touch the heart of the existing order", and there is perhaps no question that "touch[es] the heart of the existing order" more than the question about human existence itself. *Id.*

After exhausting all attempts to redress this ongoing blatant affront to the rights guaranteed by the First Amendment to the United States Constitution, Plaintiffs have been left with no alternative than to seek court intervention and obtain the injunctive relief to which they are entitled.

**JURISDICTION & VENUE**

1.      This is a civil rights action that raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, as well as federal statutory law, including, Title IX of the Education Amendments of 1972, and 42 U.S.C. § 1983.

2.      This Court has original jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

3.      This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

4.      Venue is proper in this district and this division pursuant to 28 U.S.C. § 1391(b) because all acts giving rise to this action occurred in this district and division and upon information and belief, all individual Defendants reside within this district and division.

**PARTIES**

**I.  PLAINTIFFS**

5.      Plaintiff Nathan Feldman is an adult resident of Denver County, Colorado and the father of his two minor children, O.F. and N.F., who are twin siblings in the third grade at the Slavens School.

6.      Plaintiff O.F. is an 8-year-old heterosexual, Caucasian, binary/'cisgender' minor female child enrolled in the third grade at the Slavens School.  At all times relevant, O.F. resides in Denver County, Colorado and she brings this action by and through her Father and Next Friend, Nathan Feldman.

7.     Plaintiff N.F. is an 8-year-old heterosexual, Caucasian, binary/'cisgender' minor male child enrolled in the third grade at the Slavens School.  At all times relevant, N.F. resides in Denver County, Colorado and he brings this action by and through his Father and Next Friend, Nathan Feldman.

## II.   DEFENDANTS

8.     Defendant Denver Public Schools ("DPS" or the "District") is a public education school system and a recipient of federal financial assistance located in Denver, Colorado. DPS is required to appoint and employ a superintendent to manage the schools within its jurisdiction and within Denver County in a fashion consistent with state law and the policy determinations of the School Board. At all times relevant, DPS controlled, directed, and exercised authority over all schools within its jurisdiction, including the Slavens School and all staff and employees who work at the Slavens School.

9.     Defendant Denver Public Schools Board of Education (the "Board" or "School Board") is the governing body over all public schools within the DPS jurisdictional limits, including the Slavens School. At all times relevant, the DPS School Board has final policymaking authority over all policies applicable to all DPS schools, including the Slavens School. The Board is also charged with *inter alia* the power to select and to terminate the DPS Superintendent and to establish educational goals and policies for DPS schools and the Board is responsible for ensuring its polices are consistent with the requirements of state and federal law.

10.    Defendant Alex Marrero ("Dr. Marrero") is the superintendent of Denver Public Schools. As superintendent, Dr. Marrero functions as DPS' chief executive and he is responsible for the management of its employees, including all school principals, teachers, faculty, and staff employed by DPS. Dr. Marrero is responsible for the implementation and enforcement DPS School

Board policies, and he otherwise is tasked with the duty of setting the culture and tone within each of the DPS schools.

11.     Defendant Kurt Siebold ("Mr. Siebold") is the Principal of the Slavens School and a DPS employee. At all times relevant, the acts, statements, and omissions of Mr. Siebold complained of herein were taken (or not taken) or spoken within the scope of Mr. Siebold's employment and therefore, all of the allegations involving Mr. Siebold are imputable against the District under the theory of *respondeat superior*. Mr. Siebold is sued in both his official capacity as well as his individual capacity.

12.     Defendant Katherine Diaz ("Ms. Diaz") is the District's Family Constituency Specialist and a DPS employee. At all times relevant, the acts, statements, and omissions of Ms. Diaz complained of herein were taken (or not taken) or spoken within the scope of Ms. Diaz's employment and therefore, all of the allegations involving Ms. Diaz are imputable against the District under the theory of *respondeat superior*. Ms. Diaz is sued in both her official capacity, as well as her individual capacity.

13.     Defendant Christina Sylvester ("Ms. Sylvester") is the District's Director of Operations and a DPS employee. At all times relevant, the acts, statements, and omissions of Ms. Diaz complained of herein were taken (or not taken) or spoken within the scope of Ms. Sylvester's employment and therefore, all of the allegations involving Ms. Sylvester are imputable against the District under the theory of *respondeat superior*. Ms. Sylvester is sued in both her official capacity, as well as her individual capacity.

14.     Defendant Kelly Walters ("Ms. Walters") is a Teacher at the Slavens School and a DPS employee. At all times relevant, the acts, statements, and omissions of Ms. Walters complained of herein were taken (or not taken) or spoken within the scope of Ms. Walters'

employment and therefore, all of the allegations involving Ms. Walters are imputable against the District under the theory of *respondeat superior*. Ms. Walters is sued in her official capacity.

15.     Defendant Gretel Pavao ("Ms. Pavao") is a Teacher at the Slavens School and a DPS employee. At all times relevant, the acts, statements, and omissions of Ms. Pavao complained of herein were taken (or not taken) or spoken within the scope of Ms. Pavao's employment and therefore, all of the allegations involving Ms. Pavao are imputable against the District under the theory of *respondeat superior*. Ms. Pavao is sued in her official capacity.

## STATEMENT OF FACTS

### I.  Background

1.     On or about October 6, 2022, Mr. Feldman contacted Barbara Smith and Joanne Stroud via email after he noticed during a school event that each Slavens School classroom had a Pride Flag displayed beside each classroom door.

2.     In his e-mail, Mr. Feldman inquired as to the origins of the schoolwide display due to the fact that Pride Flags are not inclusive of all Slavens School students and only represent one viewpoint on the topic of sex.[1]

3.     Mr. Feldman explained that he did not take issue with the Pride Flag displays and he was not requesting that they be taken down; rather, Mr. Feldman simply asked if he could provide a flag identical in size and nature to the Pride Flags that represented his children's views on the same topic.

4.     Mr. Feldman included two photographs (as shown below) in his e-mail—one depicting a Pride Flag displayed beside the classroom door and the other depicting the flag Mr. Feldman had offered to provide for display so that his children's views could also be represented.

---

[1] The topic of "sex" includes sexual orientation and gender identity. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1740–43 (2020) (holding the protected class of "sex" includes sexual orientation and gender identity).





*Progress Pride Flag on display*                    *Flag Mr. Feldman requested be displayed*

5.      Neither Ms. Smith nor Ms. Stroud responded to Mr. Feldman's request.

6.      On October 27, 2022, Mr. Feldman contacted DPS officials again regarding his concerns that the Slavens School had begun teaching second grade students about the topic of sex, including sexual orientation and gender identity. Mr. Feldman also explained that he was disturbed by the fact that DPS officials[2]  had also instructed these children not to tell their parents about the discussions and lessons they had been taught at school.

7.       After thoroughly explaining his concerns, the basis for his concerns, and the reasons he believed that these topics were inappropriate for discussion, Mr. Feldman asked a handful of questions, including *inter alia* whether DPS would permit students whose views were not represented by Pride Flags to display a flag that represented their views in an identical or nearly identical fashion.

8.      Mr. Feldman concluded his email reiterating that his inquiry was merely intended to ensure the Slaver School's learning environment was inclusive of all students, not only those whose beliefs and views aligns with the beliefs and views of the District.

---

[2] The term "DPS officials" includes members of its Board of Education, its superintendent, its principals, its teachers, and any other staff or employee(s) employed by Denver Public Schools.

9.      Later that afternoon, on October 27, 2022, Mr. Feldman received an e-mail from Kurt Siebold, the Slavens School principal, regarding Mr. Feldman's concerns.

10.     In his e-mail, Mr. Siebold stated that he disagreed with Mr. Feldman's "understanding of the pride flag" and explained that the District's "core value" and curriculum afford students and staff the *right* to speak and express the District's favored view on the topic of sex, but DPS *does not* extend this right to students and staff whose views differ from the District's views.

11.     Mr. Siebold's e-mail is supported by published District policy, which states in pertinent part:

> the District supports **the right** of its employees to post in their classrooms, offices, or halls **a rainbow flag or other sign of support for LGBTQIA+ students or staff**, because these are symbols consistent with the District's equity-based curriculum.[3]

12.      The policy confirms what Mr. Siebold previously conveyed: DPS policy does not allow students or staff to speak or express support for students or staff who are not members of the LGBTQIA+ community or who otherwise hold views that differ from the District's favored viewpoint.

13.     Due to the facially unconstitutional and discriminatory nature of this policy, Mr. Feldman still had questions, and he respectfully replied to Mr. Siebold's aforementioned email acknowledging receipt and to let Mr. Siebold know he would follow up with his additional questions later on that week.

14.     That Friday, November 4, 2022, Mr. Feldman followed up with Mr. Siebold concerning what seemed to be a statistical anomaly whereas 100% of the Slavens School teachers

---

[3] Resolution on Inclusion for Our LGBTQIA+ Employees, Students, and Community Members, DENVER PUBLIC SCHOOLS, available at: https://shorturl.at/GHJL1  (last accessed Nov. 8, 2023).

chose to exercise their right to post Pride Flags outside their classroom doors as opposed to refraining from posting such flags.

15.     During the 2022-2023 school year, the Slavens School employed approximately (40) full-time teachers. To constitute a "right", each individual teacher would independently have had to *choose* to display a Pride Flag outside their classroom. Notwithstanding the variables associated with the choice in displaying another flag (e.g., the American Flag or heterosexual flag)—a choice Slavens School teachers did not have—two possible variables remain: display a Pride Flag, or refrain from displaying a Pride Flag.

16.     The probability of that a given teacher would elect to display a Pride Flag is 1 of 2, or 50%. For two teachers to both choose to display a Pride Flag, you would multiply the probability of one event by the probability of the other, since these are independent events. So, for two teachers, the probability that both chose to exercise their "right" to display a Pride Flag would be $(1/2) * (1/2) = 1$ of 4, or 25%.

17.     In order for 40 teachers to each independently make the same exact decision, raise the probability to the power of 40 (as each teacher's decision is an independent event) and the statistical result is roughly 0.0000000000909, or about 9 in 100 trillion.

18.     Being that **the probability that every single Slaven's teacher *chose* to display a Pride Flag outside their classrooms is 9 in 100 trillion**, questioning the likelihood of such an unlikely event actually occurring organically is needless to say, well within question.

19.     And the reasonableness of Mr. Feldman's good faith inquiry into the legitimacy of the assertion the Pride Flags were voluntarily displayed and not required to be displayed is only exacerbated by the fact that the very DPS policy that purportedly vests Slavens School teachers

with the "right" to display the District's favored viewpoint is also the same policy that states in pertinent part:

> **[T]he District will continue to push** the federal and state government and national corporations to eliminate binary categories that prohibit students from self-identifying outside of those non-binary gender categories; and
>
> **[T]he District will not wait for such adult acceptance or require parents' or guardians' consent** before honoring the student's self-reported gender identity and gender expression.[4]

20.     Based on the fact that DPS only authorizes its favored viewpoint to be displayed, and the fact that DPS has published a policy revealing its desired objective in doing so is grounded in activism—not equality—there is sufficient reason to question whether DPS compels the display of Pride Flags despite its representations to the contrary.

21.     On November 13, 2022, Mr. Siebold responded to Mr. Feldman's November 4 inquiry as to (1) whether DPS teachers chose to hang Pride Flags or whether the District required them to do so; and (2) whether the Slavens School or the District as a whole prohibited any other viewpoints from being expressed or displayed in similar fashion.

22.     While Mr. Siebold's response evaded the first question, he did squarely answer the second question, stating "**DPS doesn't allow for other flags**." (emphasis added).

23.     The District's decision to speak and express its favored view on the topic of sex while contemporaneously prohibiting any other viewpoint on the same topic from being spoken about or expressed in a similar or identical manner epitomizes the very governmental restriction of speech the First and Fourteenth Amendments prohibit.

24.     Due to the spectacularly cavalier openness with which Mr. Siebold admits it is District policy to violate the First and Fourteenth Amendments, Mr. Feldman wanted to ensure

---

[4] *Id.*, *supra* fn. 3.

there was no misunderstanding as the willingness to disclose violations of federal law is less than common, to say the least.

25.     As such, on November 15, 2022, Mr. Feldman sent an e-mail to Christina Sylvester, the District's Director of Operations, and Levi Arithson, the District's LGBTQ+ Equity Culture Program Manager, which reads:

> My goal here is for all DPS Communities to be represented and supported.
>
> Please provide the DPS policy documentation which prohibits the display of any flags other than the pride flag. I want to make sure that I'm not misunderstanding something.

26.     On November 17, 2022, Ms. Sylvester responded to Mr. Feldman's November 15 e-mail by stating *inter alia* "DPS believes in ensuring representation of our historically marginalized and invisibilized communities, including our LGBTQ+ students, staff, and families" and that unless something sexual involving Mr. Feldman's children takes place in the classroom "we considered this matter settled."

27.     Ms. Sylvester also advised Mr. Feldman that displaying the Pride Flag is:

    i.   not viewed by Denver Public Schools as sexual education of any kind;

    ii.  is supported by DPS and consistent with our policies and our core value of equity; and

    iii. not done to the exclusion of any families or children, including yours.[5]

28.     On or about November 22, 2022, Mr. Feldman responded to Ms. Sylvester and advised that while the District may consider the matter settled, he did not as his children continued to be subjected to restrictions on their speech and expression in violation of the First Amendment's

---

[5] This is provably and facially false as Plaintiffs are, *by definition*, being excluded—and such discriminatory exclusion is the entire issue at bar. Plaintiffs address this further in greater detail below.

Free Speech Clause and discriminated against on the basis of their views in violation of the Fourteenth Amendment's Equal Protection Clause.

29.     To cure for the District's past and continued deprivation of his children's constitutional rights, Mr. Feldman made the following request:

> I would like DPS permission to follow DEI to display a straight pride flag with 2 gender symbols on it in front of my children's 2nd grade classrooms at Slavens DPS. The straight pride flag is as identical to the pride flag in the following ways:
>
> i.   not viewed by Denver Public Schools as sexual education of any kind;
>
> ii.  is supported by DPS and consistent with our policies and our core value of equity; and
>
> iii. not done to the exclusion of any families or children, including yours.

30.     Ms. Sylvester ignored Plaintiff and disregarded his request.

31.     During the second week of January, Mr. Feldman met with Mr. Siebold and the District's Family Constituency Specialist, Katherine Diaz, to discuss the continued refusal to do nothing more than abide by federal anti-discrimination law and the United States Constitution and refrain from unconstitutionally restricting his children's speech and discriminating against them on the basis of their viewpoint.

32.     During the meeting, numerous alarming statements were made.

33.     Speaking on behalf of the District, Ms. Diaz said, "sexual orientation, gender identity and race protections only apply to homosexuals, people of color, and trans people", emphasizing that the District does not consider heterosexuals, Caucasians, or binary/'cisgender' people, like Mr. Feldman, O.F., or N.F., to be members of protected classes or protected against discrimination.

14

34. On January 25, 2023, Mr. Feldman sent an email thanking Ms. Diaz and Mr. Siebold for their time in meeting with Mr. Feldman and his wife and to memorialize the conversations and statements made during their meeting. Mr. Feldman explicitly included in his email Ms. Diaz's statement that the District does not recognize its straight, white, 'cisgender' students as members of protected classes and therefore, it does not respect or provide such students protections against discrimination, including discrimination on the basis of their viewpoint.

35. In concluding his email, Mr. Feldman explicitly invited Ms. Diaz and Mr. Siebold to correct his memorialization of their discussion to confirm its accuracy and to ensure he did not inadvertently mischaracterize anything that had been said.

36. Neither Ms. Diaz nor Mr. Siebold sought any correction as to any of Mr. Feldman's recitations of the statements made during their meeting, including Ms. Diaz's statement regarding the District's policy to deprive straight, white, 'cisgender' students of their constitutional and federal statutory rights to be free from discrimination, including discrimination on the basis of their viewpoint, at school.

37. Later that day, on January 25, 2023, Ms. Diaz responded and provided Mr. Feldman with a copy of the policy per his request. She did not seek any correction of Mr. Feldman's characterization and memorialization of her statement regarding heterosexual, white, binary/'cisgender' students and the District's refusal to acknowledge that heterosexual, Caucasian, and/or binary/'cisgender' students such as O.F. and N.F. are, in fact, members of protected classes based on their sexual orientation (which includes heterosexuality),  their race (which includes Caucasians), and their gender identity (which includes binary/'cisgender' individuals).[6]

---

[6] *See Bostock*, 140 S. Ct. at 1740–43 (holding the protected class based on "sex" includes sexual orientation and gender identity).

38.     On January 28, 2023, Mr. Feldman sent Ms. Diaz and Mr. Siebold an e-mail after having had time to review the District's Anti-Discrimination Policy that Ms. Diaz had provided three days earlier.

39.     In his e-mail, Mr. Feldman pointed out relevant provisions, including the following:

PROTECTED CLASSES

**The District** . . . **prohibits discrimination** . . . **based on** . . . **gender, sex, sexual orientation, gender identity or expression** . . . (collectively, "Protected Classes").

Accordingly, **no otherwise qualified student** . . . **will be . . . subjected to discrimination . . . on the basis of Protected Class status**."

DISCRIMINATION

**It is a violation of this policy to discriminate in the provision of educational** . . . **opportunities**, **benefits or privileges** . . . if the basis of that discriminatory treatment is, in whole or in part, the person's Protected Class status(es).

Discrimination of this kind may also be strictly prohibited by a variety of federal, state and local laws, including Titles VI and VII of the Civil Rights Act of 1964, the Age Discrimination Act of 1967, Title IX of the Education Amendments of 1972, and the Americans with Disabilities Act of 1990. This policy and its implementing regulations are intended to comply with the prohibitions stated in these anti-discrimination laws.

However, this policy, its implementing regulations, and the District's codes of conduct for employees and students set a higher bar for the District. Even if the concerning conduct is not unlawful under state and federal laws, it may still fail to meet the District's expectations for affirming and inclusive environments.

In these situations, the District will act to provide both support and accountability measures. We cannot accomplish the mission of the District unless we hold ourselves to high standards of our actions, our words, and how we treat and support one another in this work.

40.     Mr. Feldman then reiterated that "heterosexual" squarely falls within the protected class of "sexual orientation[7]", that "Caucasian" falls squarely within the protected class of "race",

---

[7] *See infra*, fn 7.

and that "binary/'cisgender' falls squarely within the protected class of "gender identity" and that because of O.F. and N.F.'s sexual orientation (heterosexual), the District has "denied [O.F. and N.F. of] the benefits and opportunities" the Slavens School makes available to only its students who are members of the "LGBTQIA+" community — which definitionally *excludes* heterosexual students, such as O.F. and N.F.

41.     Similarly, Mr. Feldman explained that being "binary" (e.g., "cisgender" or a human who identifies as the gender/sex determined at birth based on their genitals and chromosomes) squarely falls within the protected class of "gender identity" and that because of O.F. and N.F.'s gender identity (binary/'cisgender'), the District has "denied [O.F. and N.F. of] the benefits and opportunities" the Slavens School makes available to only its students who are members of the "LGBTQIA+" community — which definitionally *excludes* heterosexual, binary/'cisgender' students, such as O.F. and N.F.

42.     Moreover, Mr. Feldman explained that because O.F. and N.F. are heterosexual, the District has "excluded [O.F. and N.F.] from participation in" the same educational and support programs the District provides non-heterosexual students.

43.     Mr. Feldman also articulated that because O.F. and N.F. are binary/'cisgender', the District has "excluded [O.F. and N.F.] from participation in" the same educational and support programs the District provides non-binary and transgender students.

44.     Neither Mr. Siebold nor Ms. Diaz responded.

45.     On February 7, 2023, Mr. Feldman sent an email to O.F. and N.F.'s respective teachers, Joanne Stroud and Barbara Smith regarding the Pride Flags they have displayed outside each of their respective classrooms.

46.     In his email, Mr. Feldman explained that the District had repeatedly told him that it "is the right of employees" to post Pride Flags if they so choose, and based on this representation, Mr. Feldman asked whether both Ms. Stroud and Ms. Smith made the choice to display Pride Flags outside their classrooms, and if so, whether either teacher would be amenable to displaying a flag that represents his children's views and their protected classes, too.

47.     Neither Ms. Smith nor Ms. Stroud responded.

## II.   2023-2024 School Year – New Teachers, Same Problem

48.     At the beginning of the 2023-2024 school year, Mr. Feldman reached out to O.F. and N.F.'s new third-grade teachers, Gretel Pavao and Kelly Walters, respectively as both Ms. Pavao and Ms. Walters have Pride Flags displayed in and/or outside of their classrooms.

49.     Neither Ms. Pavao nor Ms. Walters display any sign, symbol, or flag that lets heterosexual, white, binary/'cisgender' students such as O.F. and N.F. know that they are just as welcome and will be treated with the same respect and support as their peers of color or their peers who are part of the LGBTQIA+ community.

50.     Moreover, Mr. Feldman also learned that, in at least Ms. Walters classroom, there exist books that are sexual in nature, which directly conflicts with Mr. Siebold's statement that no sexual content exists within the Slavens School until the fifth grade.

51.     The specific sexual content at issue here is a book O.F. had picked up from the classroom library while she and her mother attended a "Popsicle Night" at school. When O.F.'s mother looked to see what book her daughter had retrieved, she discovered the book was about a young boy who was "confused" and dressed like a girl because he was "transitioning." O.F.'s mother promptly notified Mr. Feldman of the occurrence, and he conveyed his concerns to the District.

52.     There is no doubt that a book about a boy transitioning that also dresses like a girl, is intended to address the topic of sex, and more specifically, the concept of transgenderism and gender identity.

53.     On September 1, 2023, Mr. Feldman sent Ms. Pavao and Ms. Walters an e-mail to first, ask if either teacher was amenable to displaying a flag that represents his children's views and their protected classes, in addition to the Pride Flag only representing students who share the same views as the District, and second, to inform both Ms. Pavao and Ms. Walters that he, his wife, and O.F. and N.F.'s mother all collectively agree that their children are not to be exposed to any readings, conversations, or discussions about any matters that pertain to sex, sexual orientation, or gender identity.

54.     Mr. Feldman explained that such topics will be addressed at a time he and his wife and O.F. and N.F.'s mother determine it is appropriate to have such discussions with their children, and he requested that O.F. and N.F. be provided alternative reading materials in lieu of books that are sexual in nature or similar to that which had been discovered on "Popsicle Night", as well as any other book that I'd like to request that presents questions or characters who discuss sex, sexual orientation, sexual activity, sexual intercourse, gender theory, gender identities.

55.     On September 7, 2023, Ms. Walters responded and informed Mr. Feldman that both Ms. Walters and Ms. Pavao had just discovered his e-mail in their respective spam folders but had forwarded it to Mr. Siebold so he could respond.

56.     On September 11, 2023, Mr. Siebold responded to Mr. Feldman's email even though he was not the addressee. Nevertheless, and speaking on behalf of Ms. Pavao, Ms. Walters, as well as the District, Mr. Siebold began by confirming that he consulted with the District before

he sent the subject e-mail and that the views he conveyed are the views, policies, and/or position

of the entire Denver Public Schools system.

57.    Specifically, Mr. Siebold advised Plaintiff that:

a.    the District had not changed its position concerning viewpoint discrimination, indicating the District's intent was to continue engaging in viewpoint discrimination as well as outright discrimination in violation of not only its own policy, but well-established state and federal protections against discrimination on the basis of sex and speech;

b.    Discussions involving homosexuality are appropriate for discussion amongst third-graders;

c.    The District does not seek parental permission or consent or otherwise notify parents when it teaches about topics including homosexuality, which it veils under the guise as "equity and inclusion";

d.    Parents cannot opt their children out of being exposed to homosexuality-related discussions, lessons, materials, and topics; and

e.    Parents can review materials at anytime, but they are not permitted to opine, critique, suggest, alter, or otherwise provide any feedback on the materials that are being taught to their children, including materials that include homosexual material.

58.    On October 31, 2023, Mr. Feldman sent an email to Mr. Siebold, Ms. Pavao, and

Ms. Walters confirming Ms. Pavao and Ms. Walters received the information provided to each of

them by O.F. and N.F., respectively, placing both teachers, Mr. Siebold, and the District on notice

as to its obligations under federal law to refrain from infringing upon their right to free speech as

well as their right to be free from discrimination on the basis of their viewpoint and membership

in protected classes.

59.    Specifically, the information N.F. and O.F. provided to their teachers placed them

on notice that, *inter alia*:

a.    "[S]tudents do not shed Free Speech rights at the schoolhouse gate." *Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 508 (1969);

b.  Title IX of the Education Amendments of 1972 ("Title IX"), states "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance";

c.  Discrimination on the basis of "sex" extends beyond just male and female. In *Bostock v. Clayton County*, the Supreme Court held that Title VII's prohibition on discrimination "because of . . . sex" covers discrimination based on gender, but also includes gender identity and sexual orientation. 140 S. Ct. 1731, 1740–43 (2020);

d.  While *Bostock* was a Title VII (employment) case, the reasoning behind expanding the definition of "sex" has been applied to other federal anti-discrimination laws, including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 *et seq*.);

e.  Title IX protects everyone who interacts with a school from discrimination, including parents and guardians, students, employees, and applicants;

f.  The government cannot "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943);

g.  In order to restrict speech "on the basis of invading another's rights", the school must show: the restricted speech targeted a specific student and invaded that student's rights and (2) a causal link between the restricted speech and "bullying" incident must exist;

h.  Restricted speech must target a specific student (singular), not the LGBTQ community, as a whole;

i.  Speech that merely offends someone is not enough to justify a restriction, and the government may not prohibit expression simply because society finds the idea offensive or disagreeable;

j.  "In the realm of private speech or expression, government regulation may not favor one speaker over another, [and] public schools likewise "may not silence the expression of selected viewpoints." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. at 828, 835 (1995);

k.  "A school That permits advocacy of the rights of homosexual students cannot be allowed to stifle criticism of homosexuality." *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011);

l.  The Fourteenth Amendment's Equal Protection Clause provides: No state shall . . . deny to any person within its jurisdiction the equal protection of the laws";

m. To withstand scrutiny under the Equal Protection Clause, a law may treat similarly situated persons differently only if there is a sufficient governmental reason to do so; and

n. Even in the absence of actual loss (e.g., no tangible economic loss) there is a possibility that punitive damages may be recovered. For example, in *Basista v. Weir*, the court held that nominal damages are presumed when a civil rights violation takes place, and punitive damages may be recovered without needing to show an actual, calculable monetary loss. 225 F. Supp. 619 (W.D. Pa. 1964).

60.     After placing the District on notice as to all of the above, and after Plaintiffs' repeated, exhaustive efforts to get the District to refrain from discriminating against O.F. and N.F. on the basis of their views and membership in protected classes and unconstitutionally infringing upon their rights to free speech and expression, Plaintiffs requested again, that the District provide O.F. and N.F. with the same benefits and opportunities and that it treat Plaintiffs equally and in a manner consistent with the manner in which it treats students with views that align with the District's views.

61.      Despite being placed on notice that it was discriminating and violating well-established constitutionally protected freedoms, after repeated and exhaustive efforts to get the District to abide by its obligations under federal law, the District refused to cease its unconstitutional infringement upon Plaintiff's First and Fourteenth Amendment rights. The District also refused to adhere to the federal prohibitions against viewpoint discrimination, and instead, the District, by and through Mr. Siebold, stated the following:

> [A]s I told you when we met, this matter has been settled from the district's perspective. **Your request is, again, denied**. This has been communicated to you repeatedly, by various people within the district. **The DPS position has not changed.**

62.     On November 2, 2023, Mr. Feldman expressed his disappointment in the District's decision to intentionally, knowingly, and maliciously violate the constitutional rights of his children and violate federal law prohibiting DPS from discriminating against them.

63.     On November 3, 2023, Mr. Siebold responded, confirming the District's intent to continue violating their rights and the law by simply stating, "**I am following the District's expectations**."

64.     Having exhausted all options to resolve this matter without court intervention, Plaintiffs have been left with no alternative than to commence this action.

<u>LEGAL ALLEGATIONS APPLICABLE TO ALL COUNTS</u>

65.     DPS and its Board, individually or jointly, are responsible for the enactment, enforcement, and existence of policies, resolutions, and practices related to student expression, including the policy at issue in this Complaint.

66.     The School Board has designated Dr. Marrero as the individual responsible for implementing its policies in the daily operations of all DPS schools, including the Slaver School.

67.     The School Board retains broad supervisory authority over Dr. Marrero, the assistant superintendents, the principals of each school in the District, and all other staff for the District.

68.     The District and its School Board were and are aware of the enforcement of its LGBTQ Policy and its impact on student speech.

69.     DPS and its School Board, as well as Dr. Marrero and Mr. Siebold knowingly, purposefully, and intentionally relied on the DPS' LGBTQ Policy to dictate, control, suppress, chill, and/or otherwise silence viewpoints that Defendants do not agree with on an array of different topics, including the topic of sex.

70.     By and through its LGBTQ Policy, Defendants promoted their viewpoint on the topic of sex while intentionally and purposefully suppressing Plaintiffs' viewpoint on the topic of

sex on multiple occasions, even after repeated requests to refrain from engaging in viewpoint discrimination in its schools.

71. Plaintiffs asked to have their viewpoint represented at the Slaver School in a manner consistent with Defendants' viewpoint on the topic of sex, which it prominently promotes and displays in virtually every classroom and hallway.

72. At all times relevant, Defendants promoted their viewpoint and suppressed Plaintiffs' viewpoint while acting in the scope of their public employment duties and under color of state law. In doing so, Defendants Dr. Marrero, Mr. Siebold, and other DPS officials justified their viewpoint discrimination by relying on the LGBTQ Policy DPS adopted, the DPS Board passed, and Dr. Marrero enforced and otherwise implemented.

73. The School Board has ratified and implemented the LGBTQ Policy adopted and enforced by Defendants at DPS schools, including the Slaver School.

74. All Defendants are responsible for the implementation and application of the Speech Policy and practice by school employees.

75. Students do not shed their constitutional rights at the schoolhouse gate.

76. All actions, statements, and/or omissions of DPS, its Board of Education, the Slavens School, Mr. Marrero, Mr. Siebold, Ms. Diaz, Ms. Sylvester, Ms. Walters, and Ms. Pavao complained of herein were executed by Defendants under color of state law and within the scope of their employment as governmental entities or agents of DPS.

77. Defendants continue to to engage in the acts/omissions complained of herein under color of state law and within the scope of their employment as governmental entities or agents of DPS.

78.     Defendants past, current, and promised future actions have been taken while acting under the color of state law and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the Denver Public Schools and/or Denver County, and/or the State of Colorado.

79.     O.F. has suffered irreparable harm directly and proximately because of the District's actions that have deprived her of her First and Fourteenth Amendment rights, as well as her federal statutory right to be free from discrimination on the basis of her viewpoint and her membership in one of more protected classes, including the protected class of sex.

80.     N.F. has suffered irreparable harm directly and proximately because of the District's actions that have deprived him of his First and Fourteenth Amendment rights, as well as his federal statutory right to be free from discrimination on the basis of her viewpoint and his membership in one of more protected classes, including the protected class of sex.

81.     Mr. Feldman has suffered irreparable harm directly and proximately because of the District's actions that have deprived him and/or his children of their First and Fourteenth Amendment rights, as well as Mr. Feldman and/or his children's federal statutory right to be free from discrimination on the basis of her viewpoint and his membership in one of more protected classes, including the protected class of sex.

82.     O.F. has no adequate or speedy remedy at law to correct or redress the deprivation of her rights by Defendants.

83.     N.F. has no adequate or speedy remedy at law to correct or redress the deprivation of his rights by Defendants.

84.     Mr. Feldman has no adequate or speedy remedy at law to correct or redress the deprivation of his rights by Defendants.

85.     Unless Defendants are enjoined from further violating Plaintiffs' right to free speech, their right to be free from viewpoint and sex-based discrimination, Plaintiffs will continue to suffer irreparable harm as "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

**COUNT I**
**VIOLATION OF THE FREE SPEECH CLAUSE**
**U.S. Const. amends. I, XIV; 42 U.S.C. § 1983**
**(*Against Denver Public Schools, Denver Public Schools***
**Board of Education, and the Slavens School (collectively, the "District")*)**

86.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

87.     The District is a person as intended and covered by 42 U.S.C. § 1983.

88.     At all times relevant, the District acted under color of state law and deprived Plaintiffs of their constitutionally guaranteed right to free speech.

89.     The First Amendment to the United States Constitution guarantees in pertinent part:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

90.     The Fourteenth Amendment to the United States Constitution guarantees in pertinent part:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

91.     Congress enacted 42 U.S.C. § 1983 to serve as a conduit for asserting the rights found in the Constitution and other federal statutes.

92.     Plaintiffs permissibly invoke 42 U.S.C. § 1983 because the District violated, and continues to violate, their federally guaranteed rights under the United States Constitution, including *inter alia* the First Amendment, which and states in pertinent part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

93.     The District intentionally, knowingly, purposefully, willfully, or recklessly violated Plaintiffs' First Amendment right to free speech by prohibiting them from speaking or expressing their views on the topic of sex, which is a topic on which District openly speaks about and expresses its views.

94.     It is District policy to only permit those with whom it agrees to speak and express their views on the topic of sex.

95.     It is District policy to prohibit those with whom it disagrees to speak and express their views on the topic of sex.

96.     The District speaks and expresses its views on the topic of sex, which includes sexual orientation and gender identity.

97.     The District has prohibited Plaintiffs, and continues to prohibit Plaintiffs, from speaking or expressing their views on the topic of sex, which includes sexual orientation and gender identity.

98.     The First Amendment's Freedom of Speech Clause, incorporated and made applicable here by and through the Fourteenth Amendment to the United States Constitution, prohibits censorship of protected speech and expression[8].

---

[8] The term Plaintiffs' "speech and expression" shall also be construed to be pled in the alternative and also mean (1) "Plaintiffs' speech *or* expression"; (2) "Plaintiffs' desired speech *and* expression" and (3) Plaintiffs' desired speech *or* expression".

99.     The District is a governmental entity and therefore, it is subject to the First Amendment's prohibition of governmental restriction of protected speech and expression thereof.

100.    The District has spoken about and expressed its viewpoint on the topic of sex, which includes sexual orientation and gender identity.

101.    Plaintiffs' speech or expression concerns a topic identical to the topic on which the District has, and continues to, speak and express its views: the topic of sex.

102.    Plaintiff's speech or expression is identical in nature and character to the District's speech or expression; the only difference between Plaintiffs' speech or expression and the District's speech or expression is the viewpoint held by the respective parties.

103.    The District has spoken and expressed its favored viewpoint on the topic of sex in a number of ways, including by and through requiring, coercing, incentivizing, directing, compelling, or pressuring its faculty and staff to display Progress Pride Flags beside the doors of the Slavens School's classrooms.

104.    Plaintiffs have asked the District to permit them to speak and express their viewpoint on the topic of sex in a single way, which is by displaying a flag identical or nearly identical in size and shape next to the Progress Pride Flags the District has displayed throughout the Slavens School as a means of speaking about and expressing its views on the topic of sex.

105.    It is a policy of the District to prohibit the display of any flag other than the Progress Pride Flag, as the Progress Pride Flag represents the District's favored viewpoint on the topic of sex.

106.    The Progress Pride Flag does not represent all students' views on the topic of sex, and it does not represent Plaintiffs' views on the topic of sex.

107.   The Progress Pride Flag explicitly excludes certain students, such as those who are heterosexual, Caucasian, and/or binary/'cisgender'.

108.   Plaintiffs are heterosexual, Caucasian, and/or binary/'cisgender'.

109.   Plaintiffs' views are not represented by the District through its Progress Pride Flag displays.

110.   Plaintiffs asked the District to permit them to speak about and express their views, but the District has refused to allow Plaintiffs to do so.

111.   The District knows its policy discriminates against Plaintiffs on the basis of viewpoint and otherwise restricts their constitutionally protected speech and expression.

112.   Plaintiffs speech or expression are constitutionally protected and no exception authorizing the District to restrict their speech or expression exists.

113.   Plaintiffs' speech and expression does not concern illegal drug use.

114.   Plaintiffs' speech and expression does not constitute school-sponsored speech—although it should, as the school-sponsored speech facially discriminates against members of one or more protected classes.

115.   Plaintiffs' speech and expression do not materially or substantially interfere with educational activity.

116.   To the extent the District argues Plaintiffs' speech and expression materially or substantially interferes with educational activity, any material or substantial interference can only be brought about due to a discriminatory view of heterosexual students, Caucasian students, or binary/'cisgender' students.

117.   The District does not respect or provide protections against discrimination to heterosexual students or consider heterosexual students to be members of a protected class.

118.   "Sex" is a protected class.

119.   The protected class of "sex" includes sexual orientation and gender identity.

120.   Heterosexuality is a sexual orientation and therefore, it is a protected class.

121.   Binary/'cisgender' is a gender identity, and therefore, it is a protected class.

122.   Female is a gender identity, and therefore, it is a protected class.

123.   Male is a gender identity, and therefore it is a protected class.

124.   O.F. is a female.

125.   N.F. is a male.

126.   O.F. and N.F. are members of a protected class based on their sex.

127.   "Race" is a protected class.

128.   The protected class of "race" includes Caucasian.

129.   Caucasian is a race, and therefore, it is a protected class.

130.   O.F. and N.F. are Caucasian.

131.   O.F. and N.F. are members of a protected class based on their race.

132.   The District has, pursuant to its policies and in practice, singled out Plaintiffs' speech and expression and prevented them from displaying their views in a manner consistent with the views of other students and the views of the District.

133.   The District vests a right in students and staff at the Slavens School to speak and express their views on the topic of sex, so long as their views align with the District's views.

134.   The District does not provide a right to students and staff at the Slavens School to speak or express their views on the topic of sex if the views spoken about or expressed differ from DPS' chosen and favored viewpoint on the topic.

135.    The District has, and continues to, speak and express its favored viewpoint on the topic of sex through prominently displaying Progress Pride Flags throughout its school, next to classroom doors, inside classrooms, and in the Slavens School's hallways.

136.    The Progress Pride flag is not inclusive of all students and, by definition, explicitly excludes students who are heterosexual, Caucasian, and/or binary/'cisgender'.

137.    The District knows the Progress Pride Flag is not inclusive of all students but it has nevertheless adopted and enforced a policy that does not allow other flags to be displayed.

138.    Plaintiffs' speech or desired speech is constitutionally protected and it does not fall into any category or exception under which the District may permissibly regulate or restrict it.

139.    Plaintiffs' speech or desired speech concerns the topic of sex, and the District freely and openly speaks on the topic of sex and expresses its favored viewpoint on the topic of sex through a variety of means, including *inter alia* publicly displaying Pride Flags outside each classroom and within its classrooms and hallways.

140.    The District's speech is not inclusive of all students.

141.    The District's flag policy is not inclusive of all students.

142.    The District's speech is not inclusive of Plaintiffs.

143.    The District's flag policy is not inclusive of Plaintiffs.

144.    The District has deprived, and continues to deprive, Plaintiffs of their right to free speech and expression.

145.    Defendants' actions are, in whole or in part, unlawfully motivated by their disagreement with the Plaintiffs' viewpoint concerning the topic of sex and therefore, the District's refusal to permit Plaintiffs also constitute unlawful viewpoint discrimination.

34. In depriving Plaintiffs of these rights, Defendants acted under color of state law.

146.   O.F.'s speech is protected speech under the First Amendment.

147.   N.F.'s speech is protected speech under the First Amendment.

148.   Mr. Feldman's speech is protected speech under the First Amendment.

149.   O.F.'s desired speech is protected speech under the First Amendment.

150.   N.F.'s desired speech is protected speech under the First Amendment.

151.   Mr. Feldman's desired speech is protected speech under the First Amendment.

152.   Viewpoint-based restrictions, whether in a public or nonpublic forum, are unconstitutional.

153.   Defendants' censorship of Plaintiff's speech and expression on the topic of sex while freely speaking on and expressing its views on the exact same topic constitute viewpoint discrimination, which is unconstitutional in any type of forum.

154.   Defendants expressly interpret their policy in a viewpoint discriminatory manner, and intend for its policy to discriminate on the basis of viewpoint.

155.   Defendants expressly interpret their policy to prohibit the expression of certain viewpoints without regard to whether the expression materially or substantially disrupts the school, its operations, or its environment, or the achievement of any legitimate pedagogical objective.

156.   The District's viewpoint discriminatory policies and practices impose an unconstitutional heckler's veto because they permit the restriction of protected student expression merely because school officials deem a student's expression "offensive" to others.

157.   Prior restraints on speech may not delegate overly broad discretion to government decision-makers, may not allow for content-based restrictions, must further a compelling government interest, must be narrowly tailored, and must be the least restrictive means available.

158.     The District's policies and practices prohibiting Plaintiffs from speaking or expressing their views impose an unconstitutional prior restraint because they vest school officials with unbridled discretion to permit or deny student expression subject to no standards or guidelines, thereby permitting viewpoint-based enforcement of what views may be heard or spoken in its schools, including the Slavens School.

159.     The District's policies and practices prohibiting Plaintiffs from speaking or expressing their views are overbroad because they sweep within their ambit protected First Amendment expression.

160.     The District's policies and practices prohibiting Plaintiffs from speaking or expressing their views are overbroad because they restrict student speech that does not and will not materially and substantially disrupt the educational process.

161.     The overbreadth of the District's policies and practices prohibiting Plaintiffs from speaking or expressing their views chill the speech of students who might seek to engage in private expression through the wearing of messages on their clothing.

162.     The District has no compelling or legitimate reason that would justify their censorship of the message that Plaintiffs' seek to express.

163.     The District's policies and practices prohibiting Plaintiffs from speaking or expressing their views are not the least restrictive means of achieving any compelling interest they may allege.

164.     The District's policies and practices prohibiting Plaintiffs from speaking or expressing their views are not reasonably related to any legitimate pedagogical concerns.

165.     Censoring students' protected speech *per se* is not and cannot be a legitimate pedagogical concern.

166.    The District has purposefully, intentionally, willfully, and knowingly violated Plaintiffs' First Amendment rights, even after being placed on notice that it was doing so and despite Plaintiffs' repeated requests to refrain from further violating their First Amendment rights.

167.    This intentional deprivation of constitutional rights is a policy of the District and therefore, gives rise to liability and damages under 42 U.S.C. § 1983 as it constitutes a *Monell* violation.

168.    As a direct and proximate result of the unlawful deprivation of Plaintiffs' constitutional right to free speech and expression under the First Amendment to the United States Constitution, Plaintiffs have suffered, and continue to suffer irreparable harm.

169.    Plaintiffs also seek punitive damages against Defendants Kurt Siebold and Katherine Diaz, who are sued in their individual capacities due to the blatant, intentional, repeated, purposeful, willful, and knowing violations of law articulated above.

170.    Plaintiffs expressly and explicitly notified Defendants Kurt Siebold and Katherine Diaz that their rights were being violated, placed them on notice that their rights were being violated, explained the legal bases as to why their rights were being violated, and despite this full notice and awareness, Kurt Siebold, Katherine Diaz, and Christina Sylvester each, individually, chose to continue to abide by an unlawful District policy and violate Plaintiffs rights with abject disregard for doing so.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, and provide Plaintiff with the following relief:

A.    That this Court issue a Preliminary and Permanent Injunction enjoining Defendants, their officials, agents, employees, and all persons in active concert or

participation with them, from enforcing the District's policy challenged herein both facially and as-applied so as to prohibit Plaintiffs from displaying a flag that represents their views and their protected classes;

B.  That this Court render a Declaratory Judgment, declaring the District's policy challenged herein unconstitutional, both facially and as-applied to Plaintiffs' speech and expression;

C.  That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy in order that such declarations shall have the force and effect of final judgment;

D.  That this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order;

E.  That this Court grant an award of actual and nominal damages against Denver Public Schools to Plaintiffs in an amount this Court deems appropriate;

F.  That this Court grant an award of punitive damages against Defendants Kurt Siebold, individually, Christina Sylvester, individually, and Katherine Diaz, each of whom are also sued in their individual capacities, in an amount to be determined at trial, but no less than $3,000,000.00;

G.  That this Court grant to Plaintiffs reasonable costs and expenses of this action, including attorneys' fees in accordance with 42 U.S.C. § 1988;

H.  That this Court grant the requested injunctive relief without a condition of bond or other security being required of Plaintiffs; and

I:  That this Court grant such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury on all issues so triable.


Dated: November 9, 2023

Respectfully submitted,

/s/ *Michael A. Yoder*
Michael A. Yoder
YODER LAVEGLIA LLP
2001 L St NW, Suite 500
Washington, D.C. 20036
Tel: (202) 875-2799
myoder@yoderlaveglia.com


/s/ *Chad J. Laveglia*
Chad J. LaVeglia
YODER LAVEGLIA LLP
2001 L St NW, Suite 500
Washington, D.C. 20036
Tel: (202) 875-2799
myoder@yoderlaveglia.com

*Counsel for Plaintiffs*

## VERIFICATIONS

I, Nathan Feldman, hereby affirm under the penalties of perjury as follows:

1.  I am over the age of 18 and otherwise competent to testify.

2.  The factual allegations in the foregoing Verified Complaint are, true and accurate to the best of my knowledge and belief.

Dated: 11/8/23

Nathan Feldman

I, O.F., am the daughter of Nathan Feldman and a minor Plaintiff identified in this action. I hereby affirm under the penalties of perjury that the factual allegations in the foregoing Verified Complaint are, to the best of my knowledge and belief, true and accurate.

Dated: 11/8/23

O.F.

I, N.F., am the son of Nathan Feldman and a minor Plaintiff identified in this action. I hereby affirm under the penalties of perjury that the factual allegations in the foregoing Verified Complaint are, to the best of my knowledge and belief, true and accurate.

Dated: 11/8/23

N.F.