**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02986-RMR-STV

NATHAN FELDMAN, individually, and as Father and Next Friend on behalf of his two
minor children, O.F. and N.F.,

      Plaintiffs,

v.

DENVER PUBLIC SCHOOLS;
KURT SIEBOLD;
KATHERINE DIAZ; and
CHRISTINA SYLVESTER,

      Defendants.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Defendants' Motion to Dismiss Amended

Complaint (the "Motion").  [#34]   The Motion has been referred to this Court.  [#35]  This

Court has carefully considered the Motion and related briefing, the entire case file and the

applicable case law, and has determined that oral argument would not materially assist

in the disposition of the Motion. For the following reasons, the Court respectfully

**RECOMMENDS** that the Motion be **GRANTED**.

## I.    BACKGROUND[1]

Plaintiffs O.F. and N.F. are "8-year-old heterosexual, Caucasian, binary/'cisgender' minor" children[2] who were enrolled in the third grade at the Slavens School[3] at the time of the Complaint's filing.  [#26 at ¶¶ 6-7]  Nathan Feldman is their father.  [*Id.* at ¶ 5]

On or about October 6, 2022, Mr. Feldman emailed O.F. and N.F.'s teachers "after he noticed during a school event that each Slavens School classroom had a Pride Flag displayed beside each classroom door."[4]  [*Id.* at ¶¶ 12, 41]  Mr. Feldman explained that he "did not take issue with the Pride Flag displays and [that] he was not requesting that they be taken down."  [*Id.* at ¶ 14]  Instead, Mr. Feldman "asked if he could provide a flag identical in size and nature to the Pride Flags that represented his children's views."  [*Id.*]  Mr. Feldman's requested flag ("Plaintiffs' Flag") has a background of alternating black and white stripes, with the male and female gender symbols linked in the center of the flag.  [*Id.* at ¶ 15]  Mr. Feldman did not receive a response.  [*Id.* at ¶ 16]

On October 27, 2022, Mr. Feldman sent an email to DPS explaining his concerns and asking whether DPS would "permit students whose views were not represented by Pride Flags to display a flag that represented their views in an identical or nearly identical fashion."  [*Id.* at ¶¶ 17-19]  The Principal of Slavens School, Kurt Siebold, responded.  [*Id.*

---

[1]  The facts are drawn from the well-pleaded allegations in the Plaintiffs' Amended Complaint (the "Complaint").  [#26]  The Court accepts these allegations as true at this stage of the proceedings.  *See Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011)).

[2]  O.F. is a female child, N.F. is a male child.  [#26 at ¶¶ 6-7]

[3]  The Slavens School is within the jurisdiction of Denver Public Schools ("DPS").  [#26 at ¶ 8]  DPS is responsible for implementing policies at the Slavens School.  [*Id.* at ¶ 51]

[4]  The Complaint later alleges that "a number of teachers at the Slavens School . . . do *not* have [Pride] Flags outside of their classrooms."  [*Id.* at ¶ 44]

at ¶¶ 9, 20]  Mr. Siebold explained that he "disagreed" with Mr. Feldman's "understanding of the [P]ride [F]lag," and attached a copy of relevant DPS policy.  [*Id.* at ¶ 20]  The policy stated that DPS "supports the right of its employees to post in their classrooms, offices, or halls a rainbow flag or other sign of support for LGBTQIA+ students or staff, because these are symbols consistent with [DPS's] equity-based curriculum."  [*Id.* (emphasis omitted)]

On November 4, 2022, Mr. Feldman emailed Mr. Siebold and inquired:  "(1) whether DPS teachers chose to hang Pride Flags or whether [DPS] required them to do so; and (2) whether the Slavens School or DPS [as] a whole chose to engage in viewpoint and sex-based discrimination."  [*Id.* at ¶ 22]  Mr. Siebold responded with "evasive[] non-answers" to both questions.  [*Id.* at ¶ 23]

On November 15, 2022, Mr. Feldman emailed DPS's Director of Operations, Christina Sylvester, and DPS's LGBTQ+ Equity Culture Program Manager, Levi Arithson, seeking "policy documentation which prohibits the display of any flags other than the [P]ride [F]lag."  [*Id.* at ¶ 24]  Ms. Sylvester responded, stating that "DPS believes in ensuring representation of our historically marginalized and invisibilized communities, including our LGBTQ+ students, staff, and families," and that DPS considered the matter with the flags to be "settled."  [*Id.* at ¶ 25]  Mr. Feldman responded, asserting that his children continued to be discriminated against, and requesting that DPS cure that discrimination by granting permission to display Plaintiff's Flag in front of Mr. Feldman's children's classrooms.  [*Id.* at ¶¶ 27-28]  Ms. Sylvester ignored Mr. Feldman.  [*Id.* at ¶ 29]

In January 2023, Plaintiff met with Mr. Siebold and DPS's Family Constituency Specialist, Katherine Diaz.  [*Id.* at ¶ 30]  Ms. Diaz told Mr. Feldman that DPS did not

consider "heterosexuals, Caucasians, or binary/'cisgender' people" to be members of protected classes or protected against viewpoint discrimination.  [*Id.* at ¶ 32]  After the meeting, Mr. Feldman sent an email to Mr. Siebold and Ms. Diaz memorializing the conversation and inviting them to correct any misunderstandings.  [*Id.* at ¶¶ 33-34]  No corrections were sought, and Ms. Diaz provided Mr. Feldman with a copy of DPS's anti-discrimination policy.  [*Id.* at ¶¶ 35-36]

Mr. Feldman reviewed the policy and emailed Mr. Siebold and Ms. Diaz.  [*Id.* at ¶ 37]  Mr. Feldman noted that, based on his reading of the policy, heterosexuals, Caucasians, and binary/'cisgender' people fell within protected classes.  [*Id.* at ¶ 38]  Mr. Feldman explained his belief that his children had been denied the same "benefits and opportunities" that DPS had made available to "non-Caucasian students and those who are members of the 'LGBTQIA+' community," in violation of the anti-discrimination policy. [*Id.* at ¶ 39]  Mr. Feldman did not receive a response.  [*Id.* at ¶ 40]

On February 7, 2023, Mr. Feldman emailed O.F. and N.F.'s teachers.  [*Id.* at ¶ 41]  Mr. Feldman asked whether these teachers had made the choice to display the Pride Flags, and whether either of them would be amenable to displaying Plaintiff's Flag.  [*Id.* at ¶ 42]  The teachers ignored Mr. Feldman.  [*Id.* at ¶ 43]

A new school year began and Mr. Feldman's concerns were not alleviated.  [*See id.* at ¶ 45]  Mr. Feldman sent emails to his children's teachers setting forth his understanding of the First Amendment, Fourteenth Amendment, and Title IX.  [*Id.* at ¶ 46]  The same day, Mr. Feldman had to following conversation with Mr. Siebold:

> Mr. Feldman:  I don't know how you feel about the topic, but you're in a position to guide children and mold children.
>
> Mr. Siebold: Right.

> Mr. Feldman:  And at this point, I'm seeing you're teaching children to elevate some people above others.
>
> Mr. Siebold:  Yeah.

[*Id.* at ¶ 47]  On November 2, 2023, Mr. Feldman "expressed his disappointment" in DPS's actions to an unidentified audience in an unidentified manner.  [*Id.* at ¶ 48]

Plaintiffs filed this lawsuit on November 10, 2023.  [#1]  Plaintiffs' operative Complaint alleges three causes of action:  "Viewpoint Discrimination, Violation of U.S. Const. amends. I, XIV; 42 U.S.C. § 1983" ("Claim One") [*id.* at ¶¶ 83-148]; "Sex Discrimination, Violation of Title IX of Education Amendments Act of 1972" ("Claim Two") [*id.* at ¶¶ 149-78]; and "Equal Protection, Violation of U.S. Const. amends. I, XIV; 42 U.S.C. § 1983" ("Claim Three") [*id.* at ¶¶ 179-93].  On February 27, 2024, Defendants filed the Motion before the Court, seeking to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  [#34]  Plaintiffs filed a response [#36] and Defendants filed a reply [#38].  Defendants also filed a notice of supplemental authority informing the Court that a case cited in Defendants' briefing had been reversed.  [#39]

## II.    LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss for lack of standing is considered under Federal Rule of Civil Procedure 12(b)(1).  Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests."  *Merrill Lynch Bus. Fin. Servs., Inc. v.*

*Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)).

Standing is a question of subject matter jurisdiction, and thus a basis for a Rule 12(b)(1) dismissal.  A plaintiff has constitutional standing when: (1) she has suffered an injury in fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992).  Although the plaintiff bears the burden of establishing standing, a court must accept as true all well-pleaded facts and construe all reasonable allegations in the light most favorable to the plaintiff. *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996) (citations omitted). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter.  *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).

### B.  Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) empowers a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the

elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Generally, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556). The court's ultimate duty is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

"As a general rule, the only facts [a court] consider[s] in assessing the sufficiency of a complaint are those alleged in the complaint itself." *Emps.' Ret. Sys. v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)). However, a court "may consider 'documents that the complaint incorporates by reference,' 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,' and 'matters of which a court may take judicial notice.'" *Id.* (quoting *Gee*, 627 F.3d at 1186).

III.     **ANALYSIS**

Defendants move to dismiss Claim One pursuant to the government speech doctrine [#34 at 6-10], and Claims Two and Three for lack of standing [*id*. at 11-13] and failure to state a claim [*id*. at 13-16].  Defendants also seek to dismiss Claims One and Three against the Individual Defendants on the grounds of qualified immunity [*id*. at 10-11, 16], and to dismiss Claim Two against the Individual Defendants because Title IX does not authorize claims against individuals [*id*. at 13].  The Court addresses each of Plaintiffs' Claims in turn.

A.     **Claim One**

Claim One alleges that Defendants have violated Plaintiffs' free speech rights by permitting displays of Pride Flags near classroom doors but prohibiting a similar display of Plaintiffs' Flag.  [#26 at ¶¶ 83-148]  Defendants argue that the speech at issue—the display or non-display of particular flags near classroom doors—constitutes government speech and is therefore exempt from First Amendment scrutiny.  [#34 at 6-10]

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."  *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).  "'[I]t is not easy to imagine how government could function if it lacked th[e] freedom' to select the messages it wishes to convey."  *Id.* at 208 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009)).  Accordingly, "[t]he First Amendment's Free Speech Clause does not prevent the government from declining to express a view."  *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022).  "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say,"

8

and this selection is, as a general matter, unhindered by rules against viewpoint discrimination. *Id.* at 251-52. Thus, "[t]he first and most basic question" before the Court "is whether [DPS's] flag-[displaying] program constitutes government speech. If so, [DPS] may refuse flags based on viewpoint." *Id.* at 251. And "[t]o determine whether certain communication is government speech, [courts generally] assess the following: (1) whether the forum has historically been used for government speech; (2) whether the public would interpret the speech as being conveyed by the government; and (3) whether the government has maintained control over the speech." [5] *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1170 (10th Cir. 2021) (citing *Walker*, 576 U.S. at 209-10); *see also Shurtleff*, 596 U.S. at 252 (looking to "several types of evidence to guide the analysis, including: the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression").

The Court finds that the history of flag displays, particularly within schools, weighs in favor of Defendants. *See Shurtleff*, 596 U.S. at 253 (beginning by examining the "history of flag flying, particularly at the seat of government"). As the Supreme Court explained in *Shurtleff*, governments routinely use flags to reflect their communities and

---

[5] Plaintiffs point out that these factors are not "exhaustive" and cite a concurrence in *Shurtleff* for the proposition that "[t]he ultimate question is whether the government is actually expressing its own views or the real speaker is a private party and the government is surreptitiously engaged in the 'regulation of private speech.'" [#36 at 11-12 (citing *Shurtleff*, 596 U.S. at 263 (Alito, J., concurring))] The Court agrees that its review "is not mechanical" and is "driven by [this] case's context rather than the rote application of rigid factors." *Shurtleff*, 596 U.S. at 252. But besides a brief and unelaborated reference to "the text of DPS'[s] anti-discrimination policy that directly conflicts with the reasoning Defendants allege to be the based for the Pride Flag displays," Plaintiffs confine their argument to the factors enumerated above. [#36 at 12-15] The Court therefore focuses its analysis on those factors as well.

convey governmental messages. *Id.* at 253-55. And schools traditionally control expression contained on their walls. *Cf. Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (explaining that "public schools do not possess all of the attributes of streets, parks, and other traditional public forums that time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," and holding that school facilities are nonpublic fora absent a "policy or . . . practice" of allowing "indiscriminate use" by the general public or some segment thereof); *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 929 (10th Cir. 2002) (holding school walls were a nonpublic fora, and remained so when the school district permitted students to submit tiles to be permanently affixed to the walls but created and enforced restrictions on those submissions). Plaintiffs do not appear to argue to the contrary.[6] [#36 at 14]

---

[6] The Complaint contains an allegation that "DPS has previously made their walls a public forum for students to hang flags and its history of doing so is well-documented. For example, DPS has previously permitted students to have Mexican flags hung on the walls in its schools." [#26 at ¶ 75] The Complaint cites to one news article as support, but that article merely discusses how, after flags that had been hung by a teacher were removed from a high school, a DPS spokeswoman stated that "school officials planned to rehang the Mexican flags." [*Id.* at ¶ 75 & n.6]; *Denver school will replace Mexican flags*, THE WASHINGTON TIMES (Aug. 18, 2004), *available at* https://rb.gy/du15kw (last visited July 31, 2024). The decision by DPS officials to remove and rehang flags only supports a conclusion that DPS retained authority over the expression placed on its walls, and does not support Plaintiffs' allegation that DPS has relinquished control over its walls. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) (when ruling on a motion to dismiss, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference"); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir. 1997) ("[F]actual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true."). In any event, Plaintiffs make no argument in briefing related to this allegation. [#36]

Plaintiffs instead argue that there cannot be a "history or tradition" of displaying Pride Flags in schools because the "Pride Flags [displayed] at the Slavens School did not even exist until 2019." [*Id.* at 14] This misses the point of the inquiry—which is focused on the history of the form and location of the expression, as opposed to the expression's specific content. *See Shurtleff*, 596 U.S. at 253-55 (discussing "the history of flag flying, particularly at the seat of government," not the history of the government's flying of the particular flag at issue); *see also Walker*, 576 U.S. at 210-12 (discussing "the history of license plates"); *VDARE Found.*, 11 F.4th at 1170 (asking whether "whether the forum has historically been used for government speech"). Put differently, the Court has little doubt that *Shurtleff*'s discussion of the historical importance of flag displays by government applies equally to officials flying the Texas State Flag (adopted in 1839[7]) and officials flying the Minnesota State Flag (designed in 2023 and adopted in 2024[8]). Plaintiffs next appear to argue that Pride Flags do not "represent[] an entire community" but "distinguish students based on their gender," and that there is no history or tradition of displaying such divisive flags. [#36 at 14] But virtually any flag flown will represent some particular collection of viewpoints and experiences, and the government is permitted to "choose[ ] what to say and what not to say." *Shurtleff*, 596 U.S. at 251. This necessarily includes conveying messages that some may disagree with. *Id.* at 252 (contemplating the ability of the City of Boston to "congratulate the Red Sox" without requiring it to "simultaneously transmit the views of disappointed Yankees fans"), 256

---

[7] *About Us,* TEXAS HOUSE OF REPRESENTATIVES, https://house.texas.gov/about (last visited July 31, 2024).
[8] *State Flag*, OFFICE OF THE MINNESOTA SECRETARY OF STATE, https://www.sos.state.mn.us/about-minnesota/state-symbols/state-flag/ (last visited July 31, 2024).

(contemplating the "Pride Flag" as a flag that could be "approved to reflect particular city-approved values or views").  Plaintiff has not provided support for the notion that the history of the particular flag at issue, and the strong feelings that may be elicited by that flag, should factor into the Court's analysis of the history of flag displays in schools.  For these reasons, the Court finds that the history of flag displays and expression on school walls favors Defendants.

The Court further finds that, accepting Plaintiffs' allegations as true, the government "actively shaped or controlled" the expression at issue.  *Shurtleff*, 596 U.S. at 252.  Plaintiffs allege that DPS has a policy that supports the right of its employees to display Pride Flags on school property, and that "DPS policy provides the choice to display a [Pride Flag], but it does not provide for the choice to display [Plaintiffs' Flag]." [#26 at ¶ 57]  This affirmatively alleges that DPS shapes and controls the content of the flags that it allows to be displayed on its walls.  [*See also* #36 at 4 (arguing that DPS's policy "explicitly supported the posting of rainbow flags as symbols aligned with the district's values")]  Indeed, this type of "control over the flags' content and meaning . . . is key," as such "control . . . indicate[s] that [DPS] meant to convey the flags' messages." *Shurtleff*, 596 U.S. at 256.  Unlike in *Shurtleff*—where the Supreme Court held that private flag raisings with no meaningful involvement in the flag selection by the City of Boston constituted private speech—there is a direct allegation that DPS had a written policy and clear internal guidance about what flags [employees] could fly and what those flags would communicate.  *Cf. id.* at 257 (explaining that Boston "had nothing—no written policies or clear internal guidance—about what flags groups could fly and what those flags would communicate").  Conversely, there is no allegation that DPS had a history of accepting

for display other flags submitted by the public.  *Cf. id.* at 256-58 (explaining that Boston's practice was to "approve flag raisings, without exception," and that it lacked any "meaningful involvement in the selection of flags or the crafting of their messages"). Ultimately, the Complaint alleges that DPS created a policy to specifically support Pride Flags, as they aligned with DPS's "equity-based curriculum."  [*See* #26 at ¶ 20]  This plainly "indicate[s] that [DPS] meant to convey the flags' messages."  *Shurtleff*, 596 U.S. at 256.

This finding is supported by the Ninth Circuit's decision in *Downs v. Los Angeles Unified School Dist.*, 228 F.3d 1003 (9th Cir. 2000).  There, consistent with a district-wide policy "designed to aid in the elimination of hate and the creation of a safe school environment for all students," some public high school staff members created a bulletin board inside the school building on which faculty and staff could "post materials related to Gay and Lesbian Awareness Month."  *Id.* at 1006 (quotation omitted).  Materials posted on the board did not need prior approval before posting, but were subject to oversight by the school's principal.  *Id.*  A teacher created his own competing bulletin board on school walls that expressed the view that homosexuality is immoral.  *Id.* at 1006-07.  School principals removed the teacher's materials or ordered the teacher to remove them himself, and the teacher brought suit.  *Id.* at 1007-08.  The court held that the contested expression on school walls constituted government speech.  *Id.* at 1011.  This was because "[o]nly school faculty and staff had access to post materials," the bulletin boards "were the property and responsibility of [the school]," and the school principal retained "authority over the bulletin boards' content at all times."  *Id.*  Accordingly, the court determined that the principals' "implicit acceptance of . . . material posted by school faculty

and staff that remained on the bulletin boards was equivalent to [the school and the district] itself speaking," and that the "explicit rejection of [the teacher's] posted adversarial materials was equivalent to [the school and the district] itself . . . choosing not to speak." *Id.* at 1012.

The same conclusion applies here, with more force. Plaintiffs' allegations boil down to this: DPS policy expressly accepts and supports the display of Pride Flags on school walls by teachers and staff, but DPS and school officials repeatedly rejected the display of Plaintiffs' proposed adversarial materials. [*See* #26 at ¶ 20, 90-91] Thus, instead of a simple "implicit acceptance" of Pride Flags, Plaintiffs allege that DPS has a policy affirmatively approving them. And, as in *Downs*, the fact that the flags (which in this case received prior approval through written DPS policy) were posted by individual teachers does not alter DPS's role in shaping or controlling the expression. *See also Sangervasi v. City of San Jose*, No. 22-CV-07761-VKD, 2023 WL 3604308, at *5 (N.D. Cal. May 22, 2023) (finding that the "government actively controlled and shaped the speech permitted on" police uniforms when it allowed personnel to voluntarily wear a Pride patch on that uniform).

The Court does note a potentially conflicting recent opinion out of the Eighth Circuit. In *Cajune v. Independent School District 194*, the court considered whether the display of Black Lives Matter ("BLM") posters in classrooms constituted government speech. 105 F.4th 1070, 1074 (8th Cir. 2024). The court noted that the "location of BLM posters in the teachers' classrooms, as well as the discretion provided to teachers in choosing whether to display the posters at all, support a finding of private speech." *Id.* at 1080. The court determined that the school district did not "shape or control[ ]" the

expression, because the school district "disclaimed District involvement with the posters." *Id.* at 1081.   The idea of the posters "originated with private persons," was originally rejected by the school district, and, when adopted, was reviewed by private individuals with only minimal District oversight.  *Id.* at 1079-82.  The court again emphasized the fact that the school district did not "prescribe the display of posters" on school walls, but instead "allowed individual teachers to make that decision."  *Id.*  The court concluded that, on these allegations, the school district's "statements and actions show that it relinquished control to private actors."  *Id.*

The Court does not find *Cajun* persuasive as applied to Plaintiffs' allegations. Instead of alleging that DPS has "disclaimed involvement" with the display of Pride Flags, Plaintiffs allege that DPS explicitly "supported" the display because it was "consistent with [DPS] policies and [its] core value of equity."  [#26 at ¶ 26; #36 at 4]; *compare with Cajune*, 105 F.4th at 1081 (The superintendent told the school board that:  "I don't know if I would say our goal is to have [the BLM posters] up in the schools.  Our goal is to let the teachers have the opportunity to use [the posters] if they feel it has instructional value or value in their classrooms.").  And, unlike in *Cajune*, there is no allegation that DPS's flag display policy "originated with private persons" or that DPS exercised minimal oversight in the flag review process.  Moreover, the Court candidly questions whether the source of an idea should undercut the government's ability to adopt that idea as its own.   The government is "entitled to say what it wishes and to select the views that it wants to express."  *Pleasant Grove City*, 555 U.S. at 467-68 (quotations and citations omitted). Reviewing the full marketplace of ideas and responding to the ideas that constituents advocate for appears to be a perfectly valid, if not preferred, mode of selection.  Here,

DPS selected the Pride Flag, and not Plaintiffs' Flag, as representing the message that DPS wished to convey.  This remains true regardless of how those flags or DPS's policy "originated."  Moreover, the Court has its doubts that the proper test of governmental control over expression depends on examining the government's role in formulating the "design of the [expression]."  *See Cajun*, 105 F.4th at 1082.  The Supreme Court has explained that government can "effectively control[]" the messages" that it communicates "by exercising final approval authority over the selection" and "tak[ing] ownership" of those messages, even if the content or form of the messages "were not designed or built" by the government but by private individuals.  *Pleasant Grove City*, 555 U.S. at 472-73 (quotation omitted).

Ultimately, as in *Downs* and *Pleasant Grove*, DPS exercised final approval authority over the selection of the messages displayed on its walls, and thereby actively shaped and controlled the speech at issue.  The Court finds that this control weighs in favor of the conclusion that the flag displays at issue constitute government speech.

Finally, and for largely similar reasons as discussed, the Court finds that the public would "likely perceive" DPS to be speaking through the display of Pride Flags.  The Supreme Court has provided little guidance on how to conduct this inquiry, but it clearly involves a degree of speculation.  *See Shurtleff*, 596 U.S. at 255 (imagining that a "pedestrian glimpsing" a particular flag at a particular time "might" associate the message with private citizens rather than the City's speech); *Pleasant Grove City*, 555 U.S. at 471 (determining, without citation to any factual record, what "persons who observe donated monuments" think, and concluding that "there is little chance that observers will fail to appreciate the identity of the speaker").  Here, as noted and not apparently disputed by

Plaintiffs, schools traditionally exercise control over their walls.  Thus, a display of a particular flag outside of multiple classroom doors—even if not entirely uniform—would likely be understood as conveying a message that the school has adopted as its own. This is particularly true were a member of the public to observe, as Plaintiff alleges that he observed, that "*each* Slavens School classroom had a Pride Flag displayed beside *each* classroom door."  [#26 at ¶ 12 (emphasis added); *cf. id.* at ¶ 44 (alleging that "a number of teachers" do not display the Pride Flag, but "many" do)]  Plaintiff argues that, pursuant to DPS policy, teachers have a choice as to whether or not to display a Pride Flag.  [#36 at 14-15]  But this same policy controls the content of the expression and has resulted in an allegedly uniform (or, at least significant) display, plainly attributable to DPS.  There is simply no indication "that the public is likely to perceive" that the school walls "afford[] the public an opportunity for private expression."  *Sangervasi*, 2023 WL 3604308, at *5.

For these reasons, the Court finds that the Pride Flag display at issue is government speech, and is not subject to the constraints of the First Amendment's Free Speech Clause.  The Court therefore respectfully RECOMMENDS that the Motion be GRANTED to the extent that it seeks dismissal of Claim One.

## B.      Claims Two and Three

Defendants next argue that Claims Two and Three should be dismissed for lack of standing.  [#34 at 11-13]  Because this argument implicates this Court's subject matter jurisdiction over Claims Two and Three, the Court addresses it before reaching Defendants' arguments that Claims Two and Three fail to state a claim.

To establish constitutional standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560-61).  Here, Defendants challenge the injury-in-fact requirement.  [*See* #34 at 11-13]  "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotation omitted).

First, Defendants argue that Mr. Feldman lacks standing to assert his Equal Protection and Title IX claims on his own behalf because he alleges no injury other than to his children.  [#34 at 11; *see also* #26 at ¶ 78 (alleging that "Mr. Feldman has suffered irreparable harm directly and proximately . . . in that Defendants' actions have deprived Mr. Feldman's children of their . . . Fourteenth Amendment right to equal protection[] and their federal statutory rights to be free from discrimination on the basis of their race and sex")]  Plaintiffs do not make any argument addressing Mr. Feldman's standing to bring claims on his own behalf, only arguing that the injury at issue is that "children [are] not being welcomed, accepted, or included in [DPS's] classrooms."  [*See* #36 at 15-16]  Mr. Feldman has thus waived the argument that he has standing to pursue Claims Two and Three.  *Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived." (citing *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016))).  And, in any event, "the court has found no legal authority

demonstrating that [Mr. Feldman's] concern, without more, is enough to show an injury in fact to support standing for him as a parent where all of the alleged, purported injuries appear to be to his child[ren]." *Casady v. Cherry Creek Sch. Dist. Bd. of Educ.*, No. 21-CV-02542-CMA-NYW, 2022 WL 3109599, at *7 (D. Colo. June 23, 2022), *report and recommendation adopted sub nom.*, *Ghormley v. Cherry Creek Sch. Dist. Bd. of Educ.*, No. 21-CV-02542-CMA-SKC, 2022 WL 3099145 (D. Colo. Aug. 4, 2022); *see also Doe v. Oyster River Co-op. Sch. Dist.*, 992 F. Supp. 467, 481 (D.N.H. 1997) ("Ordinarily, only participants of federally funded programs—and not the participants' parents—have standing to bring claims under Title IX."). The Court therefore respectfully RECOMMENDS that Claims Two and Three be DISMISSED WITHOUT PREJUDICE to the extent that they are brought by Mr. Feldman on his own behalf. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction, as it did here, the dismissal must be without prejudice.").

Defendants next argue that O.F. and N.F. have also failed to allege an injury in fact for Claim Two and Claim Three. [#34 at 11-13] "[T]he psychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 485-86 (1982). Relatedly, "exposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead injury in an equal protection case." *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017)). Thus, claims grounded on the assertion that selective governmental messaging discriminate

against an individual by making that individual feel like a "second-class citizen," without corresponding differential governmental treatment, do not allege an injury-in-fact sufficient to confer Article III standing. *See, e.g.*, *id.*, at 249-51 (no injury-in-fact for an individual who was "unavoidably exposed" to a flag with a message that was "painful, threatening, and offensive" to him and made him "feel like a second-class citizen"); *Sangervasi*, 2023 WL 3604308, at *7 (no injury-in-fact for a police officer who alleged that the creation of an "LGBTQ Advisory Board . . . inflicted a visibly perceptible predisposition of . . . bias" against him (citing *Valley Forge Christian Coll.*, 454 U.S. at 485-86)); *Mehdi v. U.S. Postal Serv.*, 988 F. Supp. 721, 730-31 (S.D.N.Y. 1997) (Sotomayor, District Judge) (no injury-in-fact for Muslim individuals who alleged that the display of Christmas and Chanukah symbols at the post office with no similar recognition of Muslim celebrations made them "second-class citizens" and "express[ed] the idea that Muslim heritage is less worthy of celebration" or that "Muslims are somehow inferior persons").

This exposure to allegedly discriminatory messaging is the precise conduct at issue in the case before the Court. Plaintiffs allege that O.F. and N.F. are exposed to Pride Flags, which do not represent their sexual orientation, genders, sexes, or gender identities. [#26 at ¶ 57] O.F. and N.F. are allegedly *not* exposed to flags that *do* represent their identity and values. [*Id.*] Thus, Plaintiffs assert that the message sent by the flag display is discriminatory and makes O.F. and N.F. "wonder if they are welcomed or included." [*Id.* at ¶ 186] Plaintiffs argue that O.F. and N.F. have been injured because other students were provided with "opportunities, privileges, and/or benefits in DPS educational programs including the privilege and benefit of being welcomed, included,

and accepted in their classrooms."[9]   [#36 at 15 (quoting [#26 at ¶ 146])]    But besides exposure to a message that does not represent O.F. and N.F.'s views, and DPS's and school officials' acknowledgement of this messaging, Plaintiffs provide no allegation of any "corresponding denial of equal treatment."   *Moore*, 853 F.3d at 250 ("[E]xposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead injury in an equal protection case.).   Plaintiffs plainly disagree with DPS's selected messaging, and phrase this disagreement in constitutional terms, but ultimately fail to allege any injury except exposure to a flag that they do not feel represented by.[10] This is not an injury sufficient to confer Article III standing over Plaintiffs' claims.   *See Valley Forge Christian Coll.*, 454 U.S. at 485-86.

The Court notes that the cases relied upon above primarily apply in the context of equal protection claims, and not Title IX[11] claims.   *See Moore*, 853 F.3d at 250 (recognizing that "standing often turns on the nature and source of the claim asserted" (quotation omitted)); *Sangervasi*, 2023 WL 3604308, at *7 (no injury-in-fact for an equal protection claim); *Mehdi*, 988 F. Supp. at 730-31 (recognizing the difference in standing

---

[9] The Court notes that Plaintiffs only explicitly address Title IX standing as to O.F. and N.F., and provide no argument directed towards their standing to pursue an equal protection claim.  [#36 at 15-16]  As previously discussed, any argument in favor of standing not made by Plaintiffs is subject to forfeiture or waiver.   *Ctr. for Biological Diversity*, 937 F.3d at 542.

[10] Plaintiffs do not allege that they are treated differently because other children can display Pride Flags and O.F. and N.F. cannot display Plaintiffs' Flag.  Rather, Plaintiffs allege only that *teachers* may display a Pride Flag, but do not display Plaintiffs' Flag, and thus Plaintiffs are exposed to the Pride Flag but not a flag that represents their beliefs.  As discussed herein, such an injury is insufficient for constitutional standing on an Equal Protection or Title IX claim.

[11] Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

between an equal protection claim and a First Amendment Establishment Clause claim).

Title IX claims, however, carry their own requirement that a "the plaintiff must allege that she was 'effectively denied equal access to an institution's resources and opportunities'" and the Court sees no reason why the standing analysis would differ in a Title IX claim. *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1312 (10th Cir. 2020) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)); *see also Doe v. Brown Univ.*, 896 F.3d 127, 131 (1st Cir. 2018) ("The 'subject to discrimination under' clause covers situations where a person—while participating in a funding recipient's educational program or activity—has inferior access to or is less able to enjoy the benefits of a particular educational program relative to members of the opposite sex.").  And in any event, to the extent that Plaintiffs have standing to assert a Title IX claim on behalf of O.F. and N.F., such a claim would nevertheless be subject to dismissal.  Again, besides exposure to a flag that they do not feel represented by, there is simply no allegation that O.F. and N.F. have, on the basis of their sex, been subject to any type of differential treatment or denied equal access to any of DPS's educational resources or opportunities.

Accordingly, the Court respectfully RECOMMENDS that Claims Two and Three be DISMISSED WITHOUT PREJUDICE[12] to the extent that they are brought on behalf of O.F. and N.F.  *See Brereton*, 434 F.3d at 1216.

---

[12] To the extent that any dismissal of Plaintiffs' Title IX claim is considered a dismissal under Rule 12(b)(6) instead of Rule 12(b)(1), the Court finds that dismissal without prejudice is still appropriate.  "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton*, 434 F.3d at 1219.  Neither party addresses the futility of amending the Complaint, and the Court declines to undertake a futility analysis sua sponte.

## IV.    CONCLUSION

For the reasons set forth above, the Court respectfully **RECOMMENDS** that Defendants' Motion to Dismiss Amended Complaint [#34] be **GRANTED**, as set forth above.[13]

DATED:  August 1, 2024                    BY THE COURT:

                                          s/Scott T. Varholak
                                          United States Magistrate Judge

---

[13] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review."  *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the Magistrate Judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (holding that the district court's decision to review Magistrate Judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of Magistrate Judge's order by failing to object to those portions); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the Magistrate Judge's ruling by failing to file objections).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).